UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

-v.-

BRIAN MCFADDEN,

Defendant.

S1 26 Cr. 31 (CM)

Hon. Colleen McMahon

**DEFENDANT BRIAN MCFADDEN'S SENTENCING MEMORANDUM**

## INTRODUCTION

We respectfully submit this memorandum on behalf of Brian McFadden in advance of his sentencing proceeding, scheduled for September 10, 2026, in the above-captioned case. In April of 2020, Brian participated in the falsification of corporate records – specifically, the backdating of a purchase order and associated records – to protect a $75,000 profit he had made selling shares of a company called Edison Nation for which he performed consulting work. That was a profit he should never have made, let alone tried to protect. His actions are of the type that undermine confidence in the public markets and the reputation of corporate actors for integrity, and they bring him before this Court for good reason.

However, this brief period of selfish, and illegal, decision making – which at this point in time was more than six years ago – represents a fraction of Brian's character and the overwhelmingly positive impact that he has had on others in his family and community over the course of his life. It was a serious but short-lived departure from the life Brian has built as a husband, father, professional, and force for good throughout his entire adulthood. His history speaks to a person whose life is dedicated to his wife and daughter, his and his wife's parents, and their extended family, and to someone who, to his credit, has built an honest and successful career to support his family, with the sole exception of his conduct in April of 2020.

Brian is a person of tremendous accountability, having reformed his life once before to address a dependence on alcohol. He knew he would have to do so in order to fulfill his family responsibilities, which are considerable, for which he is essential, and for which he is to be admired. He has demonstrated that sense of accountability again here. Brian surrendered to the authorities and entered a plea of guilty in this case before the Government had to seek an indictment, before receiving discovery, and without contesting the charge against him. He takes

full responsibility for his actions. His pre-indictment demonstration of accountability and the full picture of his life should, we submit, give this Court confidence that he is not a risk to make a mistake of character like this ever again.[1]

The advisory Guidelines range for Brian is four to ten months' imprisonment (a range within Zone B of the Sentencing Table), which under the Guidelines can be satisfied by a sentence of probation that includes a condition of home detention as a substitute for imprisonment. The Probation Department, having interviewed Brian and taking into account, among other things, Brian's substantial familial obligations, the short period of his offense conduct, the fact that this is Brian's first conviction, and the sentence of three years of probation that was imposed on Brian's co-defendant, Chris Ferguson, recommends a below-Guidelines sentence of four years of probation for Brian, without any part of that being served in home detention. They also recommend the imposition of a $50,000 fine on top of Brian's $75,000 forfeiture obligation.

We respectfully submit, for all of the reasons discussed below, that the Probation Department's assessment that a below-Guidelines sentence of probation and a fine is sufficient, but not greater than necessary, to achieve the objectives of sentencing in his case, is the correct one. Although a period of home detention would be within the Guidelines range, we do not believe it to be necessary here in light of Brian's history and characteristics and all of the other circumstances of the offense discussed below.

In the event that the Court were to disagree and to impose a sentence that included a period of imprisonment, we ask that the Court – consistent with Zone B of the Guidelines –

[1] Notably, since his plea Brian has also maintained employment, complied with all aspects of his supervision, continued attending Narcotics Anonymous meetings, and stayed every bit as involved in his family life as he was previously – all hallmarks of someone who has taken accountability and will continue to be a productive member of society.

permit Brian to serve any such period in home detention. This would avoid the calamity for Brian's family of his being removed from the home for any period of time. This is a case where – thankfully – the interests of justice do not require a person to serve time in a prison cell.

## A. <u>Background and Procedural History</u>

### 1. Brian's History and Characteristics

Brian was born in New Jersey in 1985. (PSR ¶ 42). He and his sister, Jenifer, were raised by their parents, Jeffrey and Joanne, in that state and enjoyed a fairly comfortable and stable childhood. (PSR ¶¶ 42-44). Brian's father worked to provide for the family, and his mother stayed at home and raised the children. (PSR ¶ 44). Brian and his sister also enjoyed the benefit of a tight-knit extended family. (PSR ¶ 44). His childhood consisted of things like sports, camping, and fishing trips. (PSR ¶ 44). Today, Brian lives in Largo, Florida with his wife, Danielle, and his daughter, Jaclyn. (PSR ¶ 47).

Much of Brian's devotion to family and community today is modeled after the upbringing he experienced for himself growing up. As he has grown his own family, he has continued to pour unwavering support and care into his loved ones, and he has become a central pillar of the extended family. (*See* Letter of Jenifer Clair (Ex. A)). His devotion is reflected in the letters submitted by his loved ones, which are attached hereto and excerpted only in part. Read in full, they paint a vivid picture of how much Brian's extended family relies on him, and of how much he embraces that responsibility.

Brian lost his mother last year. His sister Jenifer is aware of this proceeding and has been extremely supportive of him. (PSR ¶ 44). Her letter is an extraordinary testament to how much of himself Brian gives to his family – not just his own wife and daughter, but his extended family. He is, without exaggeration, one of the most important people (and steady presences) in

his sister's children's lives – by no means an occurrence that happens as a matter of routine or accident, but one that reflects a tremendous amount of effort and love. Brian has been unable to bring himself to tell his father about this case, as his father is still grieving the passing of his wife, Brian's mother, and Brian cannot bear the thought of adding to his father's present burden. (PSR ¶ 44). As Jenifer explains:

> Since our mother died, Brian has been the person who keeps the family gathering. He plans dinners, fishing trips, and vacations. Grief often causes people to withdraw even when they need one another. Brian makes the call, chooses a date, and gets us together. That has helped our children and the adults maintain a sense of continuity.

(Ex. A).

Brian is uncle to Jenifer's children and godfather to her daughters, but "[Jenifer's] children do not think of him as a relative they see only on holidays. They expect him to be present." (Ex. A). He upholds his nieces' and nephew's expectations by routinely cheering them on at countless art shows, sporting events, and school activities. (Ex. A). His role as part of the "regular structure" of Jenifer's family life has made him a comforting and trusted adult to her kids—her eldest daughter even "contacts 'Uncle Bri' when she is not yet ready to bring something to her parents." (Ex. A).[2] This place of trust Brian occupies in the lives of children who love him is greater proof of his character than can be argued in a legal memorandum.

Brian and his wife, Danielle, have been married for over a decade and have a nine-year-old daughter, Jaclyn, together. (PSR ¶¶ 45-46). Though Brian is the sole financial provider for his family, (PSR ¶ 45), "he does not come home and consider his work finished. He helps carry the household responsibilities, attends school events, manages transportation, and remains

---

[2] Brian's brother-in-law likewise writes that his own son often "run[s] off the field during a T-Ball game to hug "Uncle Bri." (Letter of Alexander Clair (Ex. E)).

involved in the details of Jaclyn's life." (*See* Letter of Danielle McFadden (Ex. B)). Brian and Danielle operate as a team at home. (Ex. B).

Danielle has severe anxiety and depression and is receiving treatment through therapy and medication. (PSR ¶ 45). It is plain that she would suffer significantly if he were to be incarcerated. Nonetheless, she believes their daughter would suffer even more. (PSR ¶ 49). Danielle explains, "It would be horrible, especially for my daughter. My dad died in January from cancer, and [Brian's] mother died the year prior. It would be devastating for us. My daughter already lost two grandparents." (PSR ¶ 49). This is especially true as "Brian and Jaclyn are together almost all of their free time." (Ex. B)). In her letter, Danielle writes,

> When Jaclyn is frightened, embarrassed, upset, or unsure of herself, her first instinct is to find her dad. She calls him her rock. I see why….This year Jaclyn was bullied at school. She talked to Brian about it when she was not ready to talk openly with everyone else. Brian met with her teacher and an administrator and helped develop a plan. He did not make the situation bigger or teach Jaclyn to respond with anger. He made sure she felt heard and safe. The plan worked, and she enjoys school again. That is the kind of father he is when no one is watching….
>
> Softball is a major part of Jaclyn's life, and Brian is at every practice and game….The tryout happened while we were in New York after my father died. Our family was grieving and handling his affairs. Brian knew how much the tryout meant to Jaclyn and how much stability softball gives her. He arranged flights from a neighboring city, drove an hour to the airport, brought her home to Florida, helped her prepare, and returned to New York after the tryout. Jaclyn made the team. In one of the hardest moments our family has faced, Brian still made sure our daughter did not lose something important to her.

(Ex. B). The McFadden family's dependence on Brian goes far beyond the financial. His presence in the home is the principal stabilizing influence in the lives of his wife and his daughter. The mental health conditions from which Danielle suffers make Brian's continued residence in the home critical for his daughter.

Brian's support of his family extends far beyond his household. Brian has been the primary source of both logistical and emotional backing for three close family members who have dealt with life-threatening illnesses. While his mother was still alive, Brian was the one who researched and arranged for in-home nursing as his mother fought cancer twice; he was also the one to accompany her to doctor's appointments. (*See* Ex. A). Later, when Danielle's father (Brian's father-in-law) was diagnosed with cancer, Brian again stepped up to coordinate countless medical appointments and also handled practical logistics like car sales and estate and property issues, to help lighten the family's load after his father-in-law passed. (*See* Letter of Karen Pannoni (Ex. C)). Now, Danielle's step-mother (Brian's mother-in-law) is suffering from the same terrible illness and Brian is her point-person, sounding board, and advisor as she navigates her diagnosis. (*See* Ex. C). As his mother-in-law summarizes, "When our family's life became hardest, Brian moved toward the need and stayed there." (Ex. C). Brian's continued presence in the home is absolutely vital for the loved ones who rely on him emotionally and practically literally each day of the year.

Brian graduated from Hamilton College in 2007. (PSR ¶ 60). From college graduation to present, he has been continuously employed, including through consulting work via companies he has started. (*See* PSR ¶¶ 65-75). As of this writing, Brian is working as a business development strategist for a Florida-based company. (PSR ¶ 65). He is also currently the sole proprietor of a consulting company, MainSpring LLC. (PSR ¶ 66).

While Brian has always maintained steady and consistent employment, for a decade following college, he struggled with a dependence on alcohol. (PSR ¶ 56). His consumption became excessive and at its height, Brian was downing up to eight liquor drinks in one sitting. (PSR ¶ 56). This abuse of alcohol also exacerbated Brian's pre-existing health conditions,

particularly the effects of his Gilbert's syndrome. (PSR ¶ 56). Knowing he was heading down an incredibly dangerous path, Brian took control of his life and sought help to get sober "because of his health and because he wanted to be fully present for our daughter and the other children in our family," as Danielle recalls. (Ex. B).

After nearly seven years of sobriety from alcohol, Brian still regularly attends Narcotics Anonymous meetings today. (PSR ¶ 56). He attends Narcotics Anonymous meetings not because he still feels a pull to drink alcohol (he does not), and not because he has ever been addicted to drugs (he has not), but because "asking for support and listening to other people help[s] him stay grounded." (Ex. B). The message at Narcotics Anonymous meetings that we have the power to take control over our lives resonates with Brian and is something he wants to remind himself of regularly.

In addition to his participation in an addiction support recovery group, Brian is a mainstay in his church community. He attends Mass every Sunday with his wife and daughter. (PSR ¶ 49; Ex. B). He also frequently takes his family to the church where his sister and relatives pray, so that the families can spend quality time together. (Ex. A). His daughter is now preparing for her First Holy Communion, and it is a particularly meaningful time for the family and their faith. (Ex. B).

Brian's contributions to his community go well beyond even his extended family. His friend Steven Schutt knows Brian, in part, from their work together for over five years organizing holiday giving for organizations like Florida Sheriffs Youth Ranches, the Mattie Williams Neighborhood Family Center, and the Largo Police Victims Unit. (*See* Letter of Steven Schutt (Ex. D)). Brian also donated his time and effort to helping people in his

community get their lives back together after a hurricane in 2024. (*See id.*). This is someone who has a wide-ranging positive impact on those around him.

None of Brian's charitable work, community presence, or devotion to family are offered here to diminish his offense conduct. Rather, we bring them to the Court's attention to help provide a complete picture of his life and to demonstrate the types of concrete commitments that will keep Brian grounded going forward.

**2. The Offense Conduct**

In April of 2020, Brian was working as a consultant for a company called Edison Nation. (PSR ¶ 8). His co-defendant, Christopher Ferguson, was the chairman and CEO of Edison Nation at the time. (PSR ¶ 7). During the COVID-19 pandemic, Edison Nation helped bring personal protective equipment (PPE), like masks and hand sanitizer products, to market. (PSR ¶ 10). Brian, along with Christopher and others, discussed a deal in April 2020 for the sale by Edison Nation of $9 million in hand sanitizer products. (PSR ¶ 12). However, a few days before the deal was to go through, the buyer notified Edison Nation that it would not be proceeding with the purchase. (PSR ¶ 12). Despite knowing that the transaction had been called off, Edison Nation issued a press release announcing that it had received over $10 million in PPE orders. (PSR ¶ 11). However, given the cancelled $9 million transaction, Edison Nation's actual PPE orders only amounted to approximately $2.6 million at the time of the press release. (PSR ¶ 14).

On the day of the issuance of the press release, Edison Nation's stock price increased by nearly 200%. (PSR ¶ 12). That same day, Brian sold 30,000 shares of Edison Nation stock. (PSR ¶ 12). He gained a profit of $75,207.70 more than he would have had he sold his shares prior to the issuance of the press release. (PSR ¶ 12).

Later, when FINRA contacted Edison Nation and requested copies of the purchase orders supporting the $10 million figure referenced in the press release, Brian arranged with another individual to create a fake purchase order backdated before the press release. (PSR ¶ 13, 15). Brian and Mr. Ferguson then helped submit the false purchase order to FINRA. (PSR ¶ 16). The false purchase order became the basis of additional misleading and untrue information conveyed to FINRA by Edison Nation. (PSR ¶ 17).

**3. Plea Agreement**

Brian self-surrendered on March 16, 2026, prior to the Government seeking an indictment against him from a grand jury. (PSR ¶ 19). The same day that he surrendered, Brian pleaded guilty to one count of the Superseding Information for falsification of books, records, and accounts in violation of Title 15, United States Code, Sections 78m(b)(2), 78m(b)(5), and 78ff; Title 17, Code of Federal Regulations, Section 240.13b2-1; and Title 18, United States Code, Section 2. As part of his plea agreement, Brian admitted to a forfeiture amount of $75,207.70.

**4. Christopher Ferguson's Sentencing**

Mr. Ferguson was sentenced on May 5 of this year. *See United States v. Christopher Ferguson*, 26 Cr. 31 (CM). Mr. Ferguson's Guidelines range was zero to six months' imprisonment. The court imposed on Mr. Ferguson a non-custodial sentence of three years' probation, and did not require a special condition of home detention. (*See* Dkt. #22).

**B. <u>Discussion</u>**

Pursuant to Title 18, United States Code, Section 3553(a), courts "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection," namely, "the need for the sentence being imposed – (A) to

reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." In addition, in determining the particular sentence to be imposed, courts "shall consider . . . the nature and circumstances of the offense and the history and characteristics of the defendant." Section 3553(a)(1). Courts must also consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6). While courts must consider the advisory Guidelines range, as well (Section 3553(a)(4)), they "may not presume that a Guidelines sentence is reasonable," *United States v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008).

Here, a sentence of four years' probation is sufficient, but not greater than necessary, to comply with the objectives set forth in the statute. Brian exercised abominable, and selfish, judgment in April of 2020, for which there is no excuse and about which there is nothing redeeming to say. But that month was an aberration from the rest of Brian's entire life to date. He is a man whose paramount focus is his family. For his whole adult life, including in the six years since his offense conduct occurred (but beginning well before he was notified of a government investigation), Brian has demonstrated an extraordinary commitment to supporting those he loves and who depend on him. His continued presence in the home is essential for the well-being of his daughter and his wife. In addition to his history and characteristics strongly militating in favor of a sentence of probation, Brian's acceptance of responsibility before indictment, the recommendation of the Probation Department after interviewing him, the sentence that the Court imposed on Mr. Ferguson, and sentences in comparable cases all weigh

heavily in favor of a below-Guidelines sentence of probation. Such a sentence could exceed Mr. Ferguson's by containing a longer probationary period, as the Probation Department recommends.

In the event that the Court disagrees and deems it necessary to impose a period of imprisonment, we respectfully ask that the Court allow Brian to serve that period as home detention, consistent with what is permitted under Zone B of the Guidelines. Although we believe that a period of home detention is disproportionately severe to what is required here to meet the objectives of the sentencing statute, allowing Brian to remain in his physical residence would ameliorate some of the harm that would be suffered by his daughter and his wife during this period. As the letters that have been submitted reveal, they truly need him at home.

**1. Brian's History and Characteristics Counsel in Favor of a Probationary Sentence**

Brian's history and characteristics, which are set out in detail above and not repeated here, heavily favor a probationary sentence. This is Brian's first conviction and his offense conduct spanned a very brief period of time. He accepted responsibility for his actions by entering a guilty plea before the Government had even obtained an indictment. And it is clear from the testimonials of those who know him that what he did in April 2020 was a total aberration from the way he has lived, and continues to live, his life.

Brian's life is centered on his daughter, his wife, his sister's children, his sister, his extended family and friends, and his sobriety. He committed, in April of 2020, a greedy act, and that is what brings him here – but he is not a greedy person. The thrust of his life has been just the opposite: as described in detail in some of the letters submitted to support him, he has given an unusual amount of himself, his time, his energy, and even money, to help other people. His

positive impact on those in his orbit is not limited to what is necessary or what is normal. He is a force for good, and that is not a turn of phrase or an abstraction in his case.

The sensitivity of this moment in time for Brian's family is, we submit, also meaningful in assessing what sentence would be sufficient, but no greater than necessary, in these circumstances. Brian's close family has suffered two recent deaths that have had an impact on his nine-year-old daughter, who relies on him for emotional security and who spends nearly all of her free time with him. His mother-in-law is currently being treated for cancer while handling her late husband's estate, and relies on Brian (among other things) to help with logistical matters and practical decisions that need to be made. His wife is suffering from anxiety and depression which enhance the importance of his presence in the home for their family. Taking Brian out of the daily mix for his family, even for a very short period of time, would be devastating, and it would be more than what is necessary here.

**2. The Nature and Circumstances of the Offense Do Not Require a Term of Imprisonment**

Brian's offense conduct was serious. It reflected a flippancy toward compliance with the law, one that is jarring in the context of the rest of his life. There is no defending it and he does not seek to do so here, as reflected by his early guilty plea.

However, thankfully, his offense conduct is not so egregious that it would compel a period of incarceration no matter the counterweight of his history and characteristics, which, as discussed above, is more than considerable. The Probation Department found that "[t]here are no identifiable victims in this offense." (PSR ¶ 20). Moreover, Brian's misconduct did not span years. From start to finish, Brian's wrongdoing in this case occupied about a month of his forty years. And while any amount of unlawful gain is a slap in the face to all of those who do not cheat the rules, this is not a case where someone pocketed millions of dollars, or even a hundred

thousand dollars, from doing wrong. Brian's gain associated with his offense conduct was roughly $75,000, a significant sum but one that is on the low end of white-collar prosecutions in this District.

None of this is to minimize Brian's offense conduct – he committed a crime and he is now a felon, and he has neither an excuse for that nor anyone to blame but himself. Rather, it is to provide some context for fact that a sentence of four years' probation, in light of Brian's history and characteristics, is consistent with the aims of sentencing in his case.

**3. A Probationary Sentence Would Avoid Unwarranted Sentencing Disparities**

Because every case is unique and every individual facing sentencing carries with them their own specific set of characteristics, personal history, and circumstances, comparing a defendant's culpability with the culpability of defendants in other criminal cases only goes so far. However, it is significant that a non-custodial sentence here would "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6). Comparison of Brian's circumstances with those in a small handful of other cases, including the sentencing of Mr. Ferguson, indicate that the Probation Department's recommendation of four years' probation is a sound one.

**a. *United States v. Christopher Ferguson*, 26 Cr. 31 (CM)**

In May of this year, the Court imposed a sentence of three years' probation on Brian's co-defendant in this case, Mr. Ferguson. Mr. Ferguson's role in the offense was comparable to Brian's. The Government will likely point out in its submission that Brian, unlike Mr. Ferguson, made an illicit profit of $75,000 in connection with the offense conduct – and they are right. But the Probation Department's recommendation of a four-year period of probation for Brian accounts for this difference between him and Mr. Ferguson, because it requires Brian to spend

more time under the supervision of the Probation Department than Mr. Ferguson. The Probation Department further recommends a fine for Brian that is double the fine imposed on Mr. Ferguson. It also bears mention that while Brian, unlike Mr. Ferguson, made a profit from his offense conduct, Mr. Ferguson, unlike Brian, was the CEO of a publicly traded company when he engaged in the offense conduct. An additional year of probation for Brian, and twice as high a fine, is a fair differentiation in punishing the conduct of the two men.

**b. *United States v. Philip Jacoby,* 17 Cr. 676 (DLC)**

In *Jacoby*, the defendant was charged with conduct comparable to Brian's—one count of creating a false and backdated memorandum intended to deceive auditors and investors by adding $1.1 million on the company's balance sheet. (Dkt. #13). The Guidelines range for *Jacoby* was the exact same as Brian's, four to ten months' incarceration. (Dkt. #19 at 11). Judge Cote imposed a sentence of time served on Mr. Jacoby followed by two years of supervised release. (Dkt. #19 at 11). In imposing this non-custodial sentence, the Court said that it was "very influenced by [his] health," "the scope of [his] criminal activity, how long it lasted, the nature of it, compared to the entirety of [his] career." (Dkt. #19 at 12). The Court stated, in part, "[T]he fact that this is the only criminal activity for which you will have been convicted in a long working career…tell[s] me that while a fine is appropriate, a financial penalty is appropriate, sending you to prison at this time would not be appropriate." (Dkt. #19 at 13). It asked rhetorically, "Do I need to send you to prison also? No." (Dkt. # 19 at 12).

Mr. Jacoby's and Brian's circumstances are not identical – Mr. Jacoby was no longer working, and suffered significant health issues. But like him, Brian has had an otherwise spotless career and a life that has been exemplary in terms of commitment to family and community, and personal integrity. The offense conduct is, like Mr. Jacoby's was, aberrational.

In addition, Brian's family health issues are indeed significant, and the effect of his being incarcerated outside the home would be disastrous. A sentence of four years' probation is proportionate here.

**c. *United States v. Joseph Balestra*, 20 Cr. 645 (PAE)**

In *Balestra*, the defendant was an MTA employee who, over the course of at least a year, submitted falsified time reports purporting that he had worked overtime hours that he did not, in fact, work. (Dkt. #137 at 37). Mr. Balestra reported a base pay of just over $100,000 and then submitted additional paperwork claiming he had worked nearly 3,000 *overtime* hours (on top of his normal hours) in the year, amounting to more than $240,000 in overtime pay. (Dkt. #137 at 39). He pleaded guilty to one count of federal program fraud, and faced a Guidelines range of 10 to 16 months' imprisonment, which falls outside of Zone B of the Guidelines. (Dkt. #137 at 34). The Court found that Mr. Balestra's offense conduct amounted to "steal[ing] from the public" (Dkt. #137 at 37); that it was "not a victimless crime" but, on the contrary, that it punished taxpayers (Dkt. #137 at 37); and that Mr. Balestra had been a "central participant in an overtime fraud scheme that was carried out on, in [the Court's] experience on the bench, an epic scale" (Dkt. #137 at 43).

For this period of misconduct, the Court sentenced Mr. Balestra to a below-Guidelines sentence of three months of incarceration followed by three months of home confinement. (Dkt. #137 at 55). The Court cited his otherwise "spotless" professional career and, notably, letters from loved ones that described Mr. Balestra as "a devoted family man, beloved husband and dad, and respected and engaged friend and neighbor and coach." (Dkt. #137 at 49, 55).

The sentence imposed on Mr. Balestra provides additional context for the appropriateness of a sentence of four years' probation in Brian's case. Brian's offense conduct took place over a

far shorter period of time; it was not "epic" in scale; and it carries a lower Guidelines range. His personal circumstances are, like Mr. Balestra's, compelling in his favor, and his family circumstances are particularly sensitive. We respectfully submit that his sentence should be materially lower than that imposed on Mr. Balestra.

**5. A Non-Custodial Sentence Is Sufficient to Accomplish Deterrence and to Promote Respect for the Law**

Finally, a non-custodial sentence here would be consistent with the objectives of deterrence and promotion of respect for the law. Nothing about this case suggests that there is a need for specific deterrence; Brian has no prior criminal convictions, and he took responsibility for his misconduct without being indicted.

There is, without a doubt, a general need to deter people from flouting the law in order to make money. But prison is not necessary to accomplish that type of deterrence in Brian's case, taking all of the other Section 3553(a) factors into account. A period of probation lasting four years, a criminal fine, a forfeiture obligation, and the considerable reputational damage Brian will (deservedly) suffer for the rest of his life and career as a convicted felon, form a substantial deterrent. And respect for the law is furthered, not undermined, by a sentence that is proportionate to the particular circumstances of the person before the Court. A sentence that addresses the whole person and the entirety of his life circumstances is the one that most promotes respect for the law.

For all of the foregoing reasons, we respectfully submit that a sentence of four years' probation and a criminal fine in this case would be just, and would be sufficient, but not greater than necessary, to achieve the aims of sentencing.

Dated: September 1, 2026
New York, New York

By: MAX NICHOLAS LLC

___/s/________________________
Max Nicholas
Aashna Rao
100 Pearl Street, Suite 1801
New York, NY 10004
(646) 741-0229
maxn@maxnicholasllc.com
*Attorneys for Brian McFadden*